AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Western District of Arkansas
Fort Smith Division

U.S. DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

**JAN 0 4 2017**

**DOUGLAS F. YOUNG**, Clerk
By
Deputy Clerk

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | Case No. **2:17 cm 1** |
| Facebook Inc. for Facebook user ID(s) #100000995906091, #100000657519984, #100001706208474, and #100001314617229 | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location)*:

**Facebook user ID(s) #100000995906091, #100000657519984, #100001706208474, and #100001314617229 more particularly described on Attachment A.**

located in the Northern District of California, there is now concealed *(identify the person or describe the property to be seized)*:

**See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ■ evidence of a crime;

- ■ contraband, fruits of crime, or other items illegally possessed;

- ■ property designed for use, intended for use, or used in committing a crime;

- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1591 | Sex Trafficking |

The application is based on these facts:

- ■ Continued on the attached sheet.

- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Robert F. Allen, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **1/4/17**
_____
*Judge's signature*

City and state:  Fort Smith, Arkansas

Mark E. Ford, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Robert F. Allen, of the Federal Bureau of Investigation (FBI) being duly sworn do hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of an Application for a Search Warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This Affidavit is made in support of an Application for a Search Warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the Government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent with the FBI currently assigned to the Fort Smith Resident Agency of the Little Rock Division.  I have been employed as a Special Agent with the FBI for over nine years.  During my employment with the FBI, I have received training concerning and have been involved in the investigation of federal criminal offenses enumerated in Title 18 of the United States Code.  Prior to the FBI, I was employed as a Certified Police Officer within the State of Arkansas for ten years. During my employment as a Police Officer, I have received training concerning and have been involved in the investigation of criminal offenses. Specifically, I have received training concerning and have been involved in the investigations of cases concerning human trafficking offenses.  My training and experience in such investigations has involved significant use of the internet and particularly obtaining pertinent evidence from social media websites.

3.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that violations of Title 18 U.S.C. Section 1591, Sex Trafficking, and Related Crimes, have been committed by Shawn JOBE. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5.      On June 20, 2014, the Fort Smith Police in coordination with a national initiative conducted a prostitution sting. Police arrested Jane Doe 1 and Jane Doe 2 for prostitution, and Shawn JOBE for Promoting Prostitution. During interviews of Jane Doe 1 and Jane Doe 2, information was provided detailing that JOBE, along with a person named "Edwin," were organizing and promoting the prostitution. Furthermore, JOBE was reported to physically beat girls to force them to have sex with him and to work as prostitutes. An example given was that JOBE had physically beaten a girl, Jane Doe 3, for not having sex with him and trying to leave. Jane Doe 1 and Jane Doe 2 explained that JOBE gets girls strung out on drugs, gets them to prostitute for him, and that he is physically abusive when they try to get out of the prostitution.

6.      On June 21, 2014, Fort Smith Police Officer David Leslie responded to a 911 hang up call to 4618 S. U Street Fort Smith, Arkansas. Upon arrival, Officer Leslie met JOBE outside of his residence, which JOBE reported had been broken into while he was in jail the night before. While speaking to the officer, JOBE stated that he started a "business" when he lost

2

his children, that his "little mind" began turning, and thought managing girls would be the best source of income.

7.     On July 1, 2014, Jane Doe 4 was interviewed and advised that she met JOBE on Facebook. JOBE then started bringing groceries to her. Jane Doe 4 stated that at first he acted like a Christian man, but then started noticing suspicious activity. Jane Doe 4 stated she ended up without a place to live around May and started staying at JOBE's house. She stated she stayed at the house to shower and do stuff, but not to reside there permanently. Jane Doe 4 stated that JOBE got her a cell phone and she started working for him with his AC company, though for just a few days. She added that JOBE's boss at the AC company, buys girls off of JOBE. She advised that JOBE tried to get her to have sex with him on many occasions and also wanted her to work as a prostitute for him. Jane Doe 4 stated that at first he would slap her for refusing to have sex or work as a prostitute, and then at one point he beat her. She detailed the incident, stating that JOBE beat her, punching her in the face and yelling, "you are going to fuck me", until JOBE's mother came in and stopped him. Jane Doe 4 believed that she had a broken rib from the beating but did not go to the hospital. She believes that JOBE would have raped her if JOBE's mother had not walked in. Jane Doe 4 explained that JOBE would talk about "putting girls out there for his homies", meaning providing girls to have sex with his friends for money or valuable items. She stated that he was careful about doing this and would sometimes exchange girls for things like electronics. Jane Doe 4 also recalled a time when JOBE got her a hotel room at the Motel 6 and then a black male later showed up to have sex. Jane Doe 4 realized that JOBE set it up. She advised that JOBE is getting young girls, getting them strung out on drugs, then forcing them into prostitution. She further stated that he is physically violent when anyone tries to get out of the situation. Jane Doe 4 admitted that JOBE provided her methamphetamine. She

3

advised that he does not do drugs, but deals and supplies all his prostitutes with any drugs they need.   Jane Doe 4 advised that there was at least three times that JOBE physically beat her for not doing what he wanted her to do.  She further said that he would often ask her to go have sex with a certain person and offer her money. She advised that JOBE tried to get her to work as a prostitute several times with the example that if she made $200 dollars, she would give him $100.00. She further advised that an older white male that was called "Edwin," was a possible partner of JOBE's. Jane Doe 4 believes that "Edwin" is either a partner or is someone working under JOBE.  Branscum stated that she received a letter about a week ago from JOBE that said if she would do what he wants her to do, he would get her out of jail. She stated she tore up the letter and threw it away, not realizing that JOBE was being investigated for his activity.

8.      On July 9, 2014, Jane Doe 4 was interviewed again.  She stated that she had sex with JOBE, and that he paid her $250.00 dollars and bought her a cell phone in exchange. Jane Doe 4 advised that JOBE took her purse with her personal items (driver's license, IDs, etc.), and had kept it.  She believed he still has had personal items/purse at his house on South U Street. She stated that JOBE took the items to make her have sex and prostitute for him.

9.      On July 1, 2014, FSPD Sgt. Chris Harris provided a DVD containing the partial results of JOBE's "phone dump", which was seized from JOBE at the time of his arrest on June 20, 2014. The DVD-R contained various photos and video clips. The photos consisted of various family photos, random pictures, and some pictures of several different females in various poses, some nude and some partially clothed.  Some pictures contained JOBE lying next to nude or partially nude females.  Some of the pictures contained multiple nude girls posing together in sexual positions.   The females identified in the pictures were Jane Doe 1, Jane Doe 2, Jane Doe 3 and Jane Doe 4.  There were also several other females that have not yet been identified.

4

Review of the videos on the DVD-R, revealed several videos of family events, and two videos of a white female, identified as Jane Doe 3, nude.  The videos of Jane Doe 3 appear taken while being coached by someone taking photos of her.  It is the investigators opinion, based on experience, that Jane Doe 3 appears to be under the influence of some intoxicating compound while being video recorded.  Also noted in the video is a male subject identified as Edwin HESSLEN in the residence appearing to take pictures.

10.     On July 10, 2014, FSPD Detective Kathy Wall provided ads for Jane Doe 1 and Jane Doe that were posted on backpage.com, an internet-based website commonly used by both prostitutes and sex traffickers to advertise prostitution services.  The ad for Jane Doe 2 has pictures of her that are the same as pictures noted on the phone dump from JOBE's phone.  The pictures of Jane Doe 1 on her backpage.com ad show her on what appears to be the same bed as Jane Doe 2's pictures, and the blanket matches the blanket in pictures of Jane Doe 3 on JOBE's phone.    Furthermore, the photos appear to be taken inside JOBE's residence, as the interior of the house is consistent with the pictures of Jane Doe 3, which she later explained were taken inside JOBE's residence.

11.     At the time of her arrest on June 20, 2014, Jane Doe 1 had multiple bruises on her arms and legs that were yellowish purple in color.  Jane Doe 1 initially denied having a "pimp" and claimed the bruises were from an ex-boyfriend.  She later admitted to becoming involved in prostitution after meeting JOBE.  Jane Doe 1 said she met JOBE through a friend at a local bar. Jane Doe 1 advised that her "boyfriend," HESSLEN, worked for Shawn managing her and Jane Doe 2.   She said she lived in JOBE's house for a portion of time with other girls who were also prostitutes.  Jane Doe 1 said she did not like JOBE and had seen him physically abuse another

girl identified as Jane Doe 3 when she attempted to leave. She was friends with Jane Doe 3 and tried to help her after JOBE had physically abused her.

12.     Jane Doe 2 was also interviewed at the time of her arrest and said as much at 80% of the money she obtained from clients went to JOBE. She said JOBE took photographs of the girls and posted the ads on backpage.com. The photographs listed on Jane Doe 2 ad were taken in the bedroom of one of JOBE's children. Jane Doe 2 said JOBE had several girls at his home and in a motel, some of which could be younger than 18. She also mentioned a girl identified as Jane Doe 3, who had tried to leave JOBE and was physically abused.

13.     Jane Doe 2 agreed to cooperate with law enforcement, contacted JOBE from her cell phone, and requested his help with a client that refused to pay. JOBE called Jane Doe 2 back and the call was placed on speaker. Jane Doe 2 expressed concern that she and Jane Doe 1 would be physically harmed by JOBE after his arrest because they had cooperated with law enforcement.

14.     On July 8, 2014, Jane Doe 3 was interviewed and advised that she had published a Facebook post that a guy named "Edwin" (identified as HESSLEN) responded to. She advised that the same day that HESSLEN responded to her Facebook post, he picked her up and took her to a church near the Season's Inn in Fort Smith, Arkansas. In the church parking lot, she met JOBE in a van along with Jane Doe 1. Jane Doe 3 stated that they all then went to JOBE's house and sat. According to Jane Doe 3, there were several other girls at JOBE'S house, and once there JOBE wanted everyone to get naked. She stated that JOBE gave her some hydrocodone, which she took, and then he got her to get naked and started videoing her and taking pictures. Jane Doe 3 stated that she was told the pictures were for posting adds on "backpage". She stated that JOBE talked about her working for him, and she knew this meant as a prostitute. She said

6

that JOBE talked about her being his main working girl, but then told her that he wanted her all to himself. Jane Doe 3 admitted that she had consensual sex with JOBE multiple times, and when she refused he got physically violent and pushed her around. She stated that she did not want to work as a prostitute, and JOBE physically beat her and did not want her to leave. Jane Doe 3 advised that she was told that she would get paid around $80.00 to $90.00 dollars for 30 minutes as a prostitute working for JOBE. She further added that HESSLEN was in on all of it. She explained that HESSLEN drives the girls around delivering them to locations, and gets illegal drugs for all the girls. She added that it was HESSLEN that delivered Jane Doe 1 and Jane Doe 2 to the hotel where they were arrested on June 20, 2014. Jane Doe 3 detailed that JOBE was keeping girls on drugs so that they would work as prostitutes. She remembered Jane Doe 1 had made $700.00 dollars in one night working as a prostitute, and she was aware of around 6 or 8 girls working as prostitutes for JOBE. She clarified that JOBE tried to get her to work as a prostitute, even taking her personal items, trying to force her to work, but she did not end up prostituting. She added that JOBE took her wallet, which has her ID social security card and other personal items in it, and kept them. She believed he does this to try to force girls to keep working for him. Jane Doe 3 was told by Jane Doe 2 that JOBE has her property, along with several other girls' property, in a shed located on his property.

15.    On July 9, 2014, Mary Jobe was interviewed. Mary explained that she was JOBE's mother, and she had been living with him. Mary advised that she started noticing suspicious behavior out of JOBE around October of 2012. Mary advised that after a period of time she noticed the suspicious activity increase, and then around January 2013 JOBE started bringing a young girl around the house. Soon after that, he started bringing more and more females by the house. Mary was shown a journal, dated from approximately March 22, 2014

through June 16, 2014. Mary advised that she had written most of the journal along with another person. Mary stated that the journal was accurate and truthful to the best of her knowledge. Mary made the journal because she became so concerned for the welfare of her grandchildren (JOBE's children), that she felt compelled to document the suspicious activity going on.   Noted in the journal, dated May 8, 2014, there was a letter found where there had been a comment about "being a prostitute". Mary noted several times in the journal about JOBE buying items for the many females, and using his SNAP-EBT card to buy food for the females. Noted on May 10, 2014 in the journal, JOBE "came back with [Jane Doe 4's] purse saying she couldn't have it back until she did what she said she'd do-(i don't know what)". Later noted in the journal on May 15, 2014, "[JOBE] took [Jane Doe 4's] purse with him".   Noted in the journal on June 1, 2014, "11:45 PM, I heard screaming and he had [Jane Doe 4] in the floor, they were fighting over the cell ph. he'd bought her...I got up and yelled 'What are you doing to her?'". Mary recalled the physical violence she noted in the journal, and advised she did not know for sure what the fight was about, but assumed it was over a phone since JOBE took the cell phone from her. Noted in the journal on June 2, 2014, "He left about 7:20 a.m. I got kids ready and took them to school. He informed me not to let any of [Jane Doe 4's] things leave this house without his permission."

16.    An investigation by FSPD obtained, via State subpoena, JOBE's Benefit Bank account with a number ending in 6216. The account information shows a $3.00 dollar purchase from JOBE's bank account on June 18, 2014, as "PURCHASE Debit card purchase at BACKPAGE.COM  866-4566877 TX".    There was also a $3.00 dollar purchase from JOBE's bank account on June 19, 2014, as "PURCHASE Debit card purchase at BACKPAGE.COM

8

866-4566877 TX".  The amounts and dates seem to coincide with the ads purchased for Jane
Doe 1 and Jane Doe 2 at the time of their arrest on June 20, 2014.

17.     On June 21, 2014, JOBE was interviewed at Homewood Suites, 7300 Phoenix
Avenue, Fort Smith, Arkansas.    JOBE arrived at the hotel pursuant to a controlled phone call
from Jane Doe 2 and was subsequently arrested on a state charge of promoting prostitution.
JOBE was advised of his *Miranda* rights, which he waived and provided the following
information.  JOBE stated he is a sex addict, and meets women that are posting prostitution ads
on backpage.com. Once he has had sex with these women, he recruits them, and instead of
working "independent," JOBE becomes their pimp. JOBE has several girls he buys food and
clothes for in exchange for sex. One of these girls, Jane Doe 3, was with him earlier in the night.
JOBE has been with some of these girls during several drug deals around the Fort Smith area, but
he has never bought any drugs himself, just that he has provided the money for the girls to buy
the drugs with.   JOBE posted the backpage.com ads for Jane Doe 1 and Jane Doe 2, and knew
they were engaging in prostitution when he came to the hotel. JOBE tells HESSLEN, to post the
backpage.com ads for approximately 10-12 other girls.    Girls typically pay JOBE in sexual
favors, but that he recently has been trying to take a percentage of the money they make when
engaging in prostitution. JOBE has not received any of the money so far, and HESSLEN has
been keeping most of the money.

18.     Subpoena results from backpage.com revealed Customer Information:

**Post ID 5529265 jonesboro**

| | |
|---|---|
| Class: | Invoice |
| Date: | 06-17-2014 |
| Type: | Online Ad |
| Ad OID: | 5529265 |
| User: | edwinyjay@outlook.com |
| Email: | edwinyjay@outlook.com |
| Name: | Shawn jobe |

9

Address:        4618 South u Street
City:           Fort Smith
State:          Arkansas
Zip:            72903
IP:             66.87.153.164

**Post ID 5528869 fort smith**
Class:          Invoice
Date:           06-17-2014
Type:           Online Ad
Ad OID:         5528869
User:           edwinyjay@outlook.com
Email:          edwinyjay@outlook.com
Name:            Shawn jobe
Address:        4618 South u Street
City:           Fort Smith
State:          Arkansas
Zip:            72903
IP:             66.87.153.164

19.     On September 3, 2014, September 18, 2014, and October 6, 2014, JOBE was interviewed.  During the interviews JOBE described his prostitution organization, and provided details on how he would recruit girls and subsequently control them.  He also provided details on the structure of his prostitution scheme and explained how he used hotels, backpage.com ads to advertise, and Green Dot cards to make the cash flow undetectable to Law Enforcement.   JOBE also discussed how he worked with other "pimps", but claimed that his motivation and benefit was sex to feed his addiction.

20.     On October 13, 2016, HESSLEN was interviewed telephonically.  HESSLEN admitting to knowing and briefly working with JOBE at an AC company out of Ozark, Arkansas.  HESSLEN also admitted to selling "dope to them whores", but denied any involvement in the trafficking of anyone.

21.     Recently, Jane Doe 1, Jane Doe 2 and Jane Doe 3 were re-interviewed, and their information was consistent with previous interviews.  The interviews revealed that there were

Facebook communications with JOBE and/or HESSLEN during the period when JOBE was recruiting and trafficking girls. The Facebook user IDs for Jane Doe 1, Jane Doe 2 and Jane Doe 3 have been identified as 100000657519984, 100001706208474 and 100001314617229, respectively.

22.     JOBE has a Facebook account from the time period when he was recruiting and trafficking girls (User ID#100000995906091).

23.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

24.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

25.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account

includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

26.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

27.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

28.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link

to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

29.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

30.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

31.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

32.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

33.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through

13

the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

34.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

35.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

36.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

37.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about the user's access or use of that application may appear on the user's profile page.

38.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings;

14

rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

39.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

40.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account numbers). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.    Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

41.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.    This "user

15

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

42.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

43.     I anticipate executing this Warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the Government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

44.     Based on the forgoing, I request that the Court issue the proposed search warrant.

45.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

46.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

47.     I further request that the Court order that all papers in support of this Application, including the Affidavit and Search Warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____

Robert F. Allen
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on January **4** , 2017.

_____

HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID(s) #100000995906091, #100000657519984, #100001706208474, and #100001314617229 that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)      All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)      All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)     The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18 U.S.C. Section 1591, Sex Trafficking of Children, and Title 18 U.S.C. Section 2422, Coercion and Enticement under Chapter 117, Transportation for Illegal Sexual Activity and Related Crimes since November 17, 2014 including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Communications between Shawn C. Jobe (User ID#100000995906091) and Victim(s)    (User    ID#100000657519984,    #100001706208474,    and #100001314617229) discussing plans and arrangements for Prostitution activities;

(b) Communications between Shawn C. Jobe (User ID#100000995906091) and Victim(s)    (User    ID#100000657519984,    #100001706208474,    and #100001314617229) discussing plans, arrangements, and instructions for the Victims's engagement in prostitution;

(c) Communication between Shawn C. Jobe (User ID#100000995906091)) and any other Facebook user relating to prostitution;

(d) Photographs sent and shared via Facebook between Shawn C. Jobe (User ID#100000995906091)    and    Victim(s)    (User    ID#100000657519984, #100001706208474, and #100001314617229).

(e) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

3

(f) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation; and

(g) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).